# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF KANSAS

**J.C. HUNT**

        **Plaintiff,**

**v.**                                                              **Case No. 05-3004-JWL**

**ROBERT SAPIEN,** *et al.*

        **Defendants.**

## MEMORANDUM AND ORDER

This case concerns a 42 U.S.C. § 1983 claim filed by Plaintiff J.C. Hunt against various prison officials at the El Dorado Correctional Facility. Those officials are: Roger Werholtz ("Secretary Werholtz"), the Secretary of Corrections for the State of Kansas; Ray Roberts ("Warden Roberts"), the Warden of El Dorado Correctional Facility; and Robert Sapien, who was Mr. Hunt's Unit Team Manager at El Dorado Correctional Facility. Based on his confinement in administrative segregation for over 850 days, Mr. Hunt alleges a constitutional deprivation of his right to due process in violation of the Fourteenth Amendment. This matter is presently before the court on defendants' Renewed Motion for Summary Judgment (doc. 92). Therein, the defendants argue that they are entitled to qualified immunity for their actions and the court agrees. Accordingly, their motion is granted.[1]

---

[1] The court notes that the defense of qualified immunity can only shield defendants from liability for damages arising from claims brought against them in their individual capacities. *Trask v. Franco*, 446 F.3d 1036, 1043 (10th Cir. 2006). The court construes the pretrial order (doc. 72) to

**I.     Statement of Material Facts**

Mr. Hunt was placed in administrative segregation at Hutchinson Correctional Facility on January 15, 2003 as an "other security risk" pursuant to Kansas Department of Corrections' Internal Management Policy and Procedure (IMPP) 20-104(I)(B)(13), which provides "the warden may place in administrative segregation . . . any inmate . . . if the inmate . . . ha[s] engaged in behavior which has threatened the maintenance of security or control in the correctional facility." The Administrative Segregation Report, included in the *Martinez* Report, states that Mr. Hunt was placed in administrative segregation because of his role as "an active leader with the BGD [Black Gangster Disciples] organization. He is known to strong arm weaker inmates and plays major games with staff." The report also states that Mr. Hunt "plays the role of enforcer for the organization and has been named as the person carrying out 'violations' that are handed down on behalf of the organization." The report goes on to describe his "past history in which he was involved in attacking a group of white [supremacists] in the facility. During the attack he was observed giving orders to other inmates."

On January 17, 2003, Mr. Hunt was transferred to El Dorado Correctional Facility, where his administrative segregation placement continued. An initial review, attended by Mr. Hunt, was conducted at that facility on January 21, 2003. Mr. Hunt's comments at that review were

---

assert claims against defendants in both their individual and official capacities in light of Mr. Hunt's request for both monetary and equitable relief. Nonetheless, because the court finds that Mr. Hunt has failed to put forth sufficient evidence indicating a constitutional violation by the defendants, as indicated later in this order, it grants summary judgment for defendants in both their individual and official capacities.

recorded: "From the time I was released in 1998 I haven't been in any trouble and I have good reports." According to Warden Roberts, following the initial review, Mr. Hunt received weekly reviews for the first two months, followed by monthly reviews, 180 day reviews, and annual reviews. At each of these reviews that he attended, Mr. Hunt was afforded the opportunity to voice his concerns regarding his placement in administrative segregation.

The Kansas Parole Board conducted parole hearings for Mr. Hunt in October of 2003 and October of 2004. Mr. Hunt was present at these hearings and had the opportunity to present factors for the board's consideration. At both hearings, the Parole Board decided to pass Mr. Hunt for parole due to the serious circumstances of his crime, his history of criminal activities, the violent nature of his crime, his previous incarceration, his failure on parole, and the objections to parole. At the 2004 parole hearing, the Parole Board decided to defer Mr. Hunt's subsequent parole hearing for three years because it determined it was not reasonable to expect that parole would be granted at a hearing if held before then, due to Mr. Hunt's presenting high risk factors. The final action notices from the Parole Board following these hearings did not mention Mr. Hunt's placement in administrative segregation as a reason for passing him for parole.

On November 11, 2004, Mr. Hunt filed a grievance form with his unit team manager, Mr. Sapien, stating: "On Jan. 15th, 2003, I was placed in admin. seg. in H.C.F. under the O.S.R. status for several unfounded allegations. I am not a gang leader or member nor have I been issued any disciplinary reports to warrant being punished in this cruel and unusual fashion." Mr. Hunt goes on to explain various other reasons why his placement in administrative segregation

3

is unwarranted. In his response to this grievance, Mr. Sapien noted that the grievance referenced the same concern voiced in several previous grievances and that his grievance response remained the same: after investigation, it was deemed appropriate to keep Mr. Hunt in administrative segregation out of concern for the safety and security of the facility, staff and other inmates.

Mr. Hunt appealed this response to Warden Roberts and ultimately to Secretary Werholtz. Secretary Werholtz's response stated that Mr. Hunt had failed to offer evidence or argument to suggest that the responses given by Warden Roberts and Mr. Sapien were inappropriate. Mr. Hunt attached documentation verifying this grievance procedure to his complaint. In early June of 2005, Mr. Hunt was transferred to a transitional housing unit to prepare him for release to general population.

Mr. Hunt filed this proceeding on January 5, 2005, alleging that his placement in administrative segregation deprived him of a constitutionally protected liberty interest[2] and violated his Fourteenth Amendment right to due process.[3] Although phrased as two separate claims in the pretrial order, the court concludes that these "separate" claims actually constitute one claim, that is, that the defendants violated Mr. Hunt's right to due process under the Fourteenth Amendment by: (1) depriving him of a constitutionally protected liberty interest (2) without adequate process. The proceeding is currently before this court on defendants' motion

---

[2] Mr. Hunt refers to the Fifth Amendment when making this claim. The court, however, will assume he meant to refer to the Fourteenth Amendment, which incorporates the Fifth Amendment protections at the state level, since there are no federal officials involved in this action.

[3] In a previous order (doc. 91), the court allowed Mr. Hunt to voluntarily dismiss an unexhausted Eighth Amendment claim with prejudice and permitted him to proceed only with his exhausted Fourteenth Amendment claim.

for summary judgment, in which they argue they are entitled to qualified immunity.

## II.     Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1258 (10th Cir. 2006). An issue of fact is "genuine" if "the evidence allows a reasonable jury to resolve the issue either way." *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006). A fact is "material" when "it is essential to the proper disposition of the claim." *Id*.

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id*. (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant may not simply rest upon his or her pleadings but must "bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which he or she carries the burden of proof." *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). To accomplish this, sufficient evidence pertinent to the

material issue "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

### III.    Analysis

The defendants in this case argue that they are entitled to qualified immunity. Qualified immunity protects government officials performing discretionary functions from individual liability under 42 U.S.C. § 1983 unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The purpose of qualified immunity is to avoid excessive disruption of governmental functions and to dispose of frivolous claims in the early stages of litigation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law. *Phillips v. James*, 422 F.3d 1075, 1080 (10th Cir. 2005).

When a defendant raises a qualified immunity defense on a motion for summary judgment, the plaintiff must overcome a heavy two-part burden: (1) the plaintiff must establish that the facts alleged, taken in the light most favorable to the plaintiff, show the defendant's conduct violated a constitutional right and, if so, (2) the plaintiff must demonstrate that the right was clearly established at the time of the defendant's allegedly unlawful actions. *Blossom v.*

*Yarbrough*, 429 F.3d 963, 967 (10th Cir. 2005) (citing *Saucier*, 533 U.S. at 201); *Phillips*, 422 F.3d at 1080 (same).

A.     *No Constitutional Violation*

In attempting to overcome the first prong of the defendants' qualified immunity defense, Mr. Hunt alleges that the defendants' violated his constitutional right to due process under the Fourteenth Amendment.

To establish such a due process violation, Mr. Hunt must first show that the defendants deprived him of a constitutionally protected liberty interest. *See Steffey v. Orman*, 461 F.3d 1218, 1221 (10th Cir. 2006)("A due process claim under the Fourteenth Amendment can only be maintained where there exists a constitutionally cognizable liberty or property interest with which the state has interfered.")(citation omitted). Although due process protections extend to prisoners, the extent of that protection is significantly less than that guaranteed to non-prisoners. *Estate of DiMarco v. Wyoming Dept. of Corr.*, 473 F.3d 1334, 1339 (10th Cir. 2007)(citing *Wolff v. McDonnell*, 418 U.S. 539, 555-557 (1974)). "[T]he Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement" for prisoners; nonetheless, "a liberty interest in avoiding particular conditions of confinement may arise from state policies or regulations." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). The Supreme Court has instructed, however, that unless the conditions of confinement "impose atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life[,]" state regulations or policies do not create a liberty interest for prisoners in the conditions of confinement. *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

7

The Tenth Circuit recently stated that in determining if a prisoner has a protected liberty interest, courts should examine whether: "(1) the segregation relates to and furthers a legitimate penalogical interest, such as safety or rehabilitation; (2) the conditions of placement are extreme; (3) the placement increases the duration of confinement, as it did in *Wilkinson*; and (4) the placement is indeterminate (in *Wilkinson* the placement was reviewed only annually)." *Estate of DiMarco*, 473 F.3d at 1342.

First, the court must examine the purpose of Mr. Hunt's placement in administrative segregation. The Administrative Segregation Report indicates that Mr. Hunt was placed in administrative segregation because he was classified as an "other security risk" due to his previous involvement with the BGD, a prison gang. Even when viewed in the light most favorable to Mr. Hunt, the record indicates that Mr. Hunt had a history of strong-arming weaker inmates, playing games with staff, and assuming the role of enforcer for the BGD; this history was listed on the Administrative Segregation Report as the reason for Mr. Hunt's placement. The court concludes that, based on this history, the prison officials had a legitimate reason to believe Mr. Hunt was a potential risk to the safety of the other inmates and correctional facilities staff, which is a legitimate penalogical interest. *See Estate of DiMarco*, 473 F.3d at 1342. Thus, this factor does not weigh in favor of Mr. Hunt.

Second, the court must examine the conditions of Mr. Hunt's confinement. Although Mr. Hunt did not have the opportunity to participate in group religious activities, intra-mural sports, track and field events, weight lifting programs, table games, music room activities, or the ability to attend concerts while in administrative segregation, he does not argue that he lacked adequate

8

clean clothing or food. Furthermore, Mr. Hunt was able to check out books, participate in some hobby craft projects, and participate in mental health programs. Although not ideal, the court concludes that Mr. Hunt's conditions were not "atypical of protective custody." *See id.* Accordingly, this factor also does not weigh in favor of Mr. Hunt.

The third and fourth factors require the court to examine whether the placement increased the duration of Mr. Hunt's confinement and whether the placement was indefinite. Mr. Hunt argues that his placement and retention in administrative segregation disqualified him from yearly parole reviews, thus indirectly increasing his sentence. Mr. Hunt relies on the Supreme Court decision from *Wilkinson* in making this argument. *Wilkinson v. Austin*, 545 U.S. 209 (2005). There, the Supreme Court determined that Ohio's decision to place a prisoner the Ohio State Penitentiary (OSP), a "supermax" maximum security prison, was atypical and significant, and thus implicated a prisoner's liberty interests. The Court recognized that, except for severe restrictions on human contact, the conditions of confinement in OSP would "likely apply to most solitary confinement facilities." *Id.* at 224. The Court determined, however, that two key components differentiated OSP from other solitary confinement facilities: (1) the placement was only reviewed annually (and thus indefinite) and (2) the placement disqualified an otherwise eligible inmate for parole consideration. *Id.* The Court stated that "[w]hile any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." *Id.*

Because neither of these atypical and significant factors are present on the facts of this case, the court concludes these factors do not weigh in Mr. Hunt's favor. Unlike the facts in

9

*Wilkinson*, Mr. Hunt has failed to put forth evidence showing that his placement increased his sentence by disqualifying him for parole. The record indicates that Mr. Hunt's placement in administrative segregation did not affect his parole eligibility, nor was it a reason stated by the Kansas Parole Board for passing him for parole for three years in October of 2004. Furthermore, it is uncontroverted that Mr. Hunt's placement was reviewed weekly for the first 60 days of his confinement and was subsequently reviewed monthly, after 180 days, and annually. Thus, unlike *Wilkinson*, Mr. Hunt's placement was not indefinite because it was not just reviewed annually.

Based upon the court's application of the factors enumerated in *Estate of DiMarco*, the court concludes that Mr. Hunt has failed to establish that his placement and continued retention in administrative segregation imposed an "atypical and significant hardship" upon him sufficient to deprive him of a protected liberty interest.[4] Accordingly, because Mr. Hunt cannot establish a constitutional due process violation, defendants are entitled to qualified immunity with respect to Mr. Hunt's claim against them in their individual capacity.

*B.    No Clearly Established Law*

Even if Mr. Hunt had established a constitutional violation sufficient to overcome the first prong of qualified immunity, he has not shown that the right was clearly established at the time he was placed in administrative segregation. To determine whether the right was clearly established, "[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable

---

[4]Because Mr. Hunt cannot establish a protected liberty interest, the court need not examine whether he was provided procedural protections sufficient to satisfy due process requirements.

officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). Mr. Hunt has the burden of articulating such clearly established law. *Walker v. City of Orem*, 451 F.3d 1139, 1151 (10th Cir. 2006); *see also Lybrook v. Farmington Mun. Sch. Bd. of Educ.*, 232 F.3d 1334, 1337 (10th Cir. 2000). To be clearly established, "'there must be a Supreme Court or other Tenth Circuit decision on point, or the clearly established weight of authority from other circuits must have found the law to be as the plaintiff maintains.'" *Murrell v. School District No. 1, Denver*, 186 F.3d 1238, 1251 (10th Cir. 1999) (quoting *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992)).

Deprivation of a protected liberty interest without due process is a clear constitutional violation. In this case, however, whether Mr. Hunt had a protected liberty interest in the conditions of his confinement was not clearly established at the time of his placement in administrative segregation.

Mr. Hunt has not cited a single case that would allow the court to find that the contours of a prisoner's liberty interest regarding his confinement was clearly established at the time of his placement in administrative segregation. Further, the Tenth Circuit acknowledged in *Fleming* that it has never held that the conditions, duration or restrictions of a prisoner's confinement created a protected liberty interest. *See Hill v. Fleming*, 173 Fed. Appx. 664, 670 (10th Cir. 2006)(gathering cases). Nor has the court located any Tenth Circuit cases since *Fleming* holding as much. Moreover, when the prison officials placed Mr. Hunt in administrative segregation in January of 2003, they did not have the benefit of *Wilkinson*, *Estate of DiMarco*, or *Fleming*. Finally, as indicated by the Tenth Circuit in *Fleming*, "[t]he law on

11

whether certain adverse conditions of confinement create a liberty interest continues to develop." *Id*. at 675. Accordingly, the court concludes that the law was not clearly established at the time of Mr. Hunt's placement in administrative segregation because it would not have been clear to the prison officials that such placement would violate a constitutionally protected liberty interest. All defendants are thus entitled to qualified immunity with respect to Mr. Hunt's individual capacity claims.[5]

**IT IS THEREFORE ORDERED BY THE COURT** that defendants' Renewed Motion for Summary Judgment (doc. 92) is granted.

**IT IS SO ORDERED.**

Dated this 29th day of March, 2007.

                                           s/ John W. Lungstrum
                                           John W. Lungstrum
                                           United States District Judge

---

[5]Because the court concludes that all defendants are entitled to qualified immunity, it need not address Secretary Werholtz's separate argument that he is entitled to qualified immunity because he did not personally participate in any of the actions complained of by Mr. Hunt.